**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FILED

OCT 3 - 2000

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

|                              |   |                   |                  |
|------------------------------|---|-------------------|------------------|
| DAVID P. EVANS *et al.*,     | : |                   |                  |
|                              | : |                   |                  |
| Plaintiffs,                  | : |                   |                  |
|                              | : |                   |                  |
| v.                           | : | Civil Action No.: | 1996-2746 (RMU)  |
|                              | : |                   |                  |
| J. BRIAN ATWOOD *et al.*,    | : |                   |                  |
|                              | : |                   |                  |
| Defendants.                  | : | Document Nos.:    | None             |

**M E M O R A N D U M   O P I N I O N**

**Addressing Objections by Member of Plaintiff Class;
Granting Final Approval to the Proposed Class Settlement Agreement**

## I.   INTRODUCTION

This matter, a class action arising under the Age Discrimination in Employment Act
("ADEA"), 29 U.S.C. §§ 621-634, comes before the court following a twelve-day bench trial.
The plaintiffs are a certified class of ninety-one former Foreign Service employees of defendant
United States Agency for International Development ("AID") whose employment was terminated
as part of a reduction in force ("RIF") in 1996.  The plaintiffs brought this action against AID
and its former Administrator, J. Brian Atwood, alleging that the defendants intentionally
discriminated against them in favor of younger employees in the manner in which they designed
and conducted the RIF.

Following extensive mediation efforts by the Honorable John Michael Facciola, United
States Magistrate Judge, the parties reached a proposed class settlement agreement ("the
settlement").  One class member has lodged objection to the settlement, Mr. Richard Delaney.

For the reasons which follow, the court concludes that the proposed settlement is
equitable.  Specifically, the court determines that the settlement allocates the monetary recovery

1



fairly between class members and class counsel; in other words, class counsel's fee is equitable and reasonable, as a percentage of the total recovery, under the circumstances of this case. Moreover, the court also determines that the settlement allocates the monetary recovery fairly between plaintiff class members and non-plaintiff class members. Lastly, the court addresses Mr. Delaney's objection and concludes that it does not identify any inequity in the agreement or otherwise provide grounds for refusing to approve the settlement.

## II.    BACKGROUND

The RIF and the Plaintiff Class. On September 27, 1996, AID terminated the employment of ninety-one direct-hire Foreign Service employees as the culmination of a RIF effort.[1] All ninety-one of the RIF'd employees were over 40 years old at the time of the RIF. *See* Px1. Over two-thirds of the plaintiffs had 15 or more years of U.S. government service and 86% had at least 10 years of government service. *See* Px1. The RIF'd employees were concentrated in the higher grades: 11 class members were Senior Foreign Service officers with the grade Officer-Counselor and 68 members were grade FS-1 or FS-2 Foreign Service officers. Four of the plaintiffs were FS-2 or FS-3 engineers, while two of the plaintiffs were FS-5 or FS-6 secretaries. *See* Px1.[2]

The Plaintiffs' Claims. The parties agree that in designing the RIF, AID focused on (or "targeted") employees in higher pay grades, who tended to be older than employees in lower pay grades. In December 1996 the named plaintiffs, thirty-seven of the terminated employees, brought suit on behalf of themselves and others similarly situated against AID and its then-Administrator, J. Brian Atwood. The plaintiffs claimed that AID discriminated on the basis of

---

[1]    Originally, 97 Foreign Service employees were selected for termination in the RIF, but six were able to participate in a "buy-out."

[2]    The highest grades were in the Senior Foreign Service, including Minister-Counsellor and Officer-Counsellor. Below Senior Foreign Service, FS-01 was the next highest grade, then FS-02, FS-03, FS-04, FS-05 and FS-06.

2

age and did not accord its older workers equal treatment with younger workers. (2d Am. Comp. ¶ 1.) Specifically, the plaintiffs alleged that the agency intentionally discriminated against older employees by targeting higher-grade employees in the RIF. The plaintiffs also contended that, in developing regulations to implement the RIF, the agency "made a series of choices that intentionally disadvantaged older workers and departed from the principles under which the Agency normally conducted its business." P's Fact 3 The plaintiffs advanced theories of both disparate impact and disparate treatment and requested declaratory and injunctive relief, back pay, attorney fees and costs.

Defendants' Arguments. The agency responded that its decision to target higher-grade employees was legitimate and based on their higher salaries, not on their age. The agency further contended that its decisions on how to formulate the RIF regulations were appropriate given the "up-or-out" system called for by the Foreign Service Act of 1980. Generally, AID contended that the choices it made in designing the RIF were based on and justified by workforce planning, i.e., its assessment of current and future agency skill needs.

Class Certification. By oral ruling on April 7, 1997, the court certified the class of former Foreign Service employees who had obtained the age of forty years or older at the time of their selection for separation. In September 1999 the defendants filed a motion to decertify the class on the ground that the class representatives had conflicts of interest on issues relating to individual relief. On September 30, 1999, this court denied the motion to de-certify and stated the rationale for its decision on the record in open court.

Dispositive Motions. In October 1997 the defendants filed a motion to dismiss the disparate-impact claim and grant summary judgment on the disparate treatment claim. In February 1998, the plaintiffs filed cross-motions for partial summary judgment as to the disparate-impact claim. In March 1999, after granting extensions requested by the parties, the court granted the defendants' motion to dismiss the disparate-impact claim on the ground that the ADEA does not admit of a disparate-impact theory of liability. The court denied the cross-motions for summary judgment on the disparate-treatment claim.

<u>Bifurcation.</u>  By order filed November 5, 1997 the court granted the parties' joint motion to bifurcate the trial, with a first phase focusing solely on the issue of general liability and the second phase, if necessary, on issues relating to individual relief.

<u>Pretrial and Trial.</u>  On September 27, 1999, following unsuccessful cross-motions to exclude various proposed expert witnesses, the parties submitted their pretrial statements, which included proposed findings of fact and conclusions of law.  The court held a pretrial conference on September 30, 1999 and the parties submitted supplemental pretrial statements on October 8, 1999.  A bench trial commenced on Monday, October 18, 1999 and concluded on Wednesday, November 3, 1999.  The court heard testimony from over 30 witnesses and received more than 375 exhibits into evidence.  Following the trial, the court received the parties' revised proposed findings of fact and conclusions of law, and objections thereto, in November 1999.  As the court was preparing to issue its decision, the parties notified the court that they had reached a settlement agreement in principle under the auspices of the Honorable John Michael Facciola, United States Magistrate Judge, and that, accordingly, a decision on the merits was not necessary.

<u>Settlement Fairness Hearing.</u>  On May 12, 2000 the court convened a fairness hearing at which class counsel delivered argument in favor of the proposed settlement.  The court afforded all class members the opportunity to comment on or object to the proposed settlement, without regard to whether they had filed written objections or comments with the court by the deadline.  At the fairness hearing, two class members expressed their opposition to, and concerns about the proposed settlement:  Mr. Richard Delaney and Mr. Howard B. Helman.  On June 19, 2000, Mr. Helman sent a letter to the court stating, "I hereby withdraw my objection to the Settlement Agreement in this case and state that I will not appeal the Court's approval of the Settlement Agreement."[3]  Thus, the court considers only Mr. Delaney's objections.

---

[3]      Also on June 19, 2000, the plaintiffs filed Mr. Helman's letter with the court, so it is part of the record.

## III.   OVERVIEW OF SETTLEMENT TERMS

### A.   Monetary Awards

The settlement calls for AID to make direct cash payments totaling $5.5 million.  The

plaintiffs propose the following allocation:

| | | |
|---|---|---|
| $63,000 to Each of 37 Named Plaintiffs | $2,331,000 | 42% |
| $22,000 to Each of 53 Non-Named Members | $1,166,000 | 22% |
| To 6 Class Members who were Never RIF'd | - 0 - | 0% |
| To the Plaintiffs' Counsel | $2,003,000 | 36% |
| **TOTAL** | **$5,500,000**[4] | **100%** |

---

[4]   To estimate the total value of the settlement to the class members,
one must also consider the value of the hiring preferences the
settlement accords them.  The parties agree that since the 1996
RIF, the personal-service-contract ("PSC") hiring of class
members has been worth about $1 million in PSC wages per year.
*See* ¶ IV-B9.  Because the settlement affords some preference to
class members, it is reasonable to assume, other things being equal,
that they will obtain PSCs at a rate equal to or greater than they did
before the settlement, when they had no such preference.  Thus, in
the three years covered by the settlement, PSC hiring will likely be
worth at least $1 million per year to the class members, for a
minimum of $3 million.

It bears emphasizing that the settlement would not require the
agency to actually extend PSCs to class members.  Thus, the court
does not assume that the hiring preference will *necessarily* lead
class members to obtain PSCs at a greater rate than they did before
the settlement.  Reasonably, the plaintiffs do not advance this
assumption.

However, there is one unsound premise in the plaintiffs' argument
as to the value of the PSC hiring preference.  The plaintiffs seek to
include the value of *all* PSC hiring over the next three years as part
of the "total value" accruing to the class members from the
proposed settlement.  The proper question, however, is how much
the PSC hiring *preference* will be worth over the 3-year life of the
settlement.  The value of the hiring preference over the next 3
years equals   [the PSC hiring of members that takes place under
the preference system]  MINUS  [the PSC hiring of members that
would have taken place without the preference system].   There is

The defendants agree to take no position on the proper allocation of the funds; they essentially acquiesce in the plaintiffs' proposal. *See* ¶ IV-A3. The class members receive $3.5 million, about 64% of the total recovery; plaintiffs' counsel will receive $2 million, about 36% of the total recovery.

## B.    Hiring Opportunities and Preferences

In addition to the monetary awards, the settlement attempts to improve class members' chances of securing employment with the agency. The settlement does not require AID to re-hire class members as direct hires, *see* ¶ IV-B11, but AID will give the class members preferential consideration for Personal Service Contracts ("PSCs") for 3 years. The agency is not *required* to actually award PSCs to class members,[5] but it must allow them to apply for PSCs on a non-competitive basis, i.e., before the agency advertises the PSCs to the general public. *See* ¶ IV-B.

To facilitate the members' pursuit of Personal Service Contracts, AID will:

(1)    notify members of their right to apply for PSCs before they are advertised;
(2)    give members thirty days to sign up for a PSC Availability List which will be distributed to all bureaus worldwide;
(3)    post PSC openings on the Internet; and
(4)    require bureaus to consider members before advertising PSCs.

*See* ¶¶ IV-B1, 2, 3, 4, 7. Every six months, members can update their information, and the agency will send the updates to its bureaus. *See* ¶ IV-B5. Significantly, members' attempts to obtain PSCs will not be limited by skill code. *See* ¶ IV-B6. The court notes the utility of this

---

no way to calculate this with confidence, of course, until the three years pass and we find out how many class members, if any, receive PSCs under the settlement's preference system. Therefore, at present the court cannot responsibly predict that the PSC "preference" system will have any monetary value to the class members. Accordingly, for purposes of evaluating the fairness of the settlement, the court excludes the potential monetary value of the PSC hiring preference from the "total recovery." This exclusion errs on the side of subjecting the settlement to more searching scrutiny, rather than less.

[5]    *See* ¶ II-B2 (no "quota, timetable or goal"); ¶ IV-B10 ("no guarantee as to the level of PSC hiring of class members, if any").

provision in the context of the underlying controversy: it avoids resurrecting the disagreement over whether the primary skill codes assigned for purposes of the RIF were appropriate or were invidiously motivated. AID contended that the RIF primary skill codes accurately reflected the plaintiffs' skills and experience, while the plaintiffs contended that the codes were designed to further the agency's alleged goal of terminating older employees.

Each bureau retains the discretion to determine whether a class member "would meet Agency needs and be available at reasonable cost." While the settlement does not rigidly circumscribe the agency's discretion, it provides examples of legitimate factors for the agency's non-arbitrary exercise of that discretion. Specifically, the bureaus may determine agency needs by considering, *inter alia*, education, training, experience, skills, language ability, incumbency, timing of availability and level of security clearance. *See* ¶ B4.

### C.    Preclusive Scope of the Settlement

The settlement generally covers and disposes of all claims the members brought or could have brought arising out of the 1996 RIF or their employment with AID through Jan. 28, 2000. This includes claims for fees, costs and interest. *See* ¶ I-A; ¶ II-B3; ¶ IV-A1. The members also relinquish their right to seek different or additional relief in any pending judicial or administrative proceeding alleging age discrimination or reprisal. *See* ¶ I-B. The court sees nothing inequitable about this provision. One reason defendants settle is precisely because a settlement establishes a fixed liability in return for protection against future claims and the risk of uncertain liabilities.

Moreover, this benefit to the defendants is balanced by a limitation on the settlement's preclusive effect: the settlement does not preclude or impair the members' claims in other fora. *See* ¶ I-B. This leaves class members free, for instance, to pursue RIF-related claims before the Foreign Service Grievance Board or the Merit System Protection Board, so long as they do not use this settlement in those proceedings. There is one exception: AID is entitled to claim an offset of any amounts paid under this settlement, against any back-pay or other monetary award in other proceedings. *See* ¶ I-B. This latter provision is the subject of class member Delaney's objection, which is addressed below.

7

## IV.   LEGAL STANDARD

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, no class action may be dismissed, settled or compromised without the approval of the court.[6]  *See* FED. R. CIV. P. 23(e); *see also Pigford v. Glickman*, 206 F.3d 1212, 1215 (D.C. Cir. 2000).  Before giving its final approval to a proposed class settlement, the court must provide adequate notice to all members of the class and conduct a "fairness hearing" to determine whether the settlement is "fair, adequate, and reasonable and not the product of collusion between the parties."  *See Thomas v. Albright*, 139 F.3d 227, 231 (D.C. Cir. 1998); *Pigford*, 206 F.3d at 1215; *accord Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996); *Sierra Club, Inc. v. Electronic Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th Cir. 1990); *Van Horn v. Trickley*, 840 F.2d 604, 606 (8th Cir. 1988); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 22 (2d Cir. 1987); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).  Moreover, Rule 23(e) requires notice and judicial approval of proposed settlements in order to "safeguard the rights of class members and allow consideration of the broader implications of a class action settlement."  *See Woodall v. Drake Hotel*, 913 F.2d 447, 451 (7th Cir. 1990).

There is "no obligatory test" in the D.C. Circuit to determine if a proposed class action settlement is fair, adequate and reasonable.[7]  *See Pigford v. Glickman*, 185 F.R.D. 82, 98

---

[6]     The U.S. Court of Appeals for the Seventh Circuit has stated that "the application of Rule 23(e) to all ADEA class actions would be beneficial [because] . . . many of the policy reasons underlying the requirements of Rule 23(e) are applicable to ADEA class actions." *Woodall v. Drake Hotel*, 913 F.2d 447, 451 (7th Cir. 1990). The primary policy rationale addressed by Rule 23(e) is the protection of the class members whose rights may not have been given adequate consideration during the settlement negotiations. *See id.*; *In re Jiffy Lube Lit.*, 927 F.2d at 158.

[7]     The First Circuit considers eight factors to determine whether a proposed class action settlement is fair, adequate and reasonable: (1) the plaintiffs' likelihood of success; (2) the amount and nature of discovery; (3) the actual settlement terms and conditions; (4) the recommendation and experience of counsel; (5) the future expense and likely duration of litigation; (6) the recommendation of neutral

parties; (7) the number and nature of objections and (8) the presence of good faith and the absence of collusion. *See Rolland v. Cellucci*, 191 F.R.D. 3, 8 (D. Mass. 2000).

The Second and Third Circuits consider nine factors: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund to a possible recovery in light of the best possible recovery and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *See Joel A. v. Giuliani*, 2000 WL 942918, *4 (2d Cir. 2000); *Stoetzner v. United States Steel Corp.*, 897 F.2d 115, 118 (3d Cir. 1990).

The Fourth Circuit considers four factors: (1) the posture of the case at the time settlement was proposed; (2) the extent of discovery that had been conducted; (3) the circumstances surrounding the negotiations and (4) the experience of counsel in the area of the class action litigation. *See In re Jiffy Lube Lit.*, 927 F.2d at 158.

The Fifth Circuit considers six factors: (1) whether the settlement was a product of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the factual and legal obstacles prevailing on the merits; (5) the possible range of recovery and the certainty of damages and (6) the respective opinions of the participants, including class counsel, class representatives and the absent class members. *See Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir.), *cert. den.*, 459 U.S. 828 (1982).

The Sixth Circuit considers six factors: (1) the likelihood of success on the merits; (2) the complexity of the litigation; (3) the stage of discovery; (4) the opinions of the parties; (5) the concerns of the class members and other interested parties and (6) the public interest. *See People First of Tennessee v. Arlington Dev. Ctr.*, 1998 WL 246146, *4 (6th Cir.), *cert. den.*, 525 U.S. 1001 (1998).

The Seventh Circuit considers four factors: (1) the strength of the case for plaintiffs on the merits, balanced against the amount

(D.D.C. 1999) (Friedman, J.); *Osher v. SCA Realty I, Inc.*, 945 F. Supp. 298, 303-304 (D.D.C. 1996) (Richey, J.).  Nevertheless, our Court of Appeals has stated, "by far the most important factor to consider is a comparison of the terms of the settlement with the likely recovery that

offered in the settlement; (2) the defendant's ability to pay; (3) the complexity, length and expense of further litigation and (4) the amount of opposition to the settlement.  *See Armstrong v. Board of School Dir. of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980).

The Eighth Circuit considers four factors:  (1) the strength of the case for plaintiffs on merit, balanced against the amount offered in the settlement; (2) the defendant's overall financial condition and ability to pay; (3) the complexity, length and expense of further litigation and (4) the amount of opposition to the settlement.  *See Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988).

The Ninth Circuit considers nine factors:  (1) the strength of plaintiff's case; (2) the risk, expense, complexity and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; (8) the reaction of the class members to the proposed settlement and (9) the financial condition of the defendant.  *See Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1241 (9th Cir. 1998).

The Tenth Circuit considers four factors:  (1) whether the proposed settlement was fairly and honestly negotiated; (2) whether serious questions of law and fact exist; (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation and (4) the judgment of the parties that the settlement is fair and reasonable. *See Gottlieb v. Wiles*, 11 F.3d 1004, 1014 (10th Cir. 1993).

The Eleventh Circuit considers six factors:  (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement and (6) the stage of proceedings at which the settlement was achieved.  *See Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).

plaintiffs would realize if the case went to trial." *See Thomas*, 139 F.3d at 231 ("the court's primary task is to evaluate the terms of the settlement in relation to the strength of [the] plaintiff's case"); *see also Pigford*, 185 F.R.D. at 98; *accord Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996); *Armstrong v. Board of Directors of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980); *Grunin v. International House of Pancakes*, 513 F.2d 114, 124 (8th Cir.), *cert. den.*, 423 U.S. 864 (1975); *Detroit v. Grinnel Corp.*, 495 F.2d 448, 455 (2d Cir. 1974); *cf. In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 212 (5th Cir. 1981) ("the district court's most important function in reviewing compromises of class actions is its consideration of the settlement terms").

Ultimately, the decision to approve a proposed class action settlement is committed to the "sound discretion of the district court." *See Pigford*, 206 F.3d at 1216; *see, e.g., Sierra Club*, 909 F.2d at 1355 ("as long as the consent decree comes within the general scope of the case made by the pleadings, furthers the objectives upon which the law is based and does not violate the statute upon which the complaint was based, the parties' agreement may be entered by the court"). Indeed, the district court's role in reviewing the decree is to protect the interests of absent class members whose rights may be affected by the settlement of the action.[8] *See Pigford*, 206 F.3d at 1216-17; *Thomas*, 139 F.3d at 231. The court, however, should not reject a settlement merely because individual class members complain that they would have received more had they prevailed after a trial. *See Thomas*, 139 F.3d at 231; *accord EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985), *cert. den.*, 478 U.S. 1004 (1986); *Williams v. Vukovich*, 720 F.2d 909, 922 (6th Cir. 1983) ("a court may not withhold approval simply because the benefits accrued from the decree are not what a successful plaintiff would have received in a fully litigated case").

---

[8]     Because ADEA class plaintiffs must file a consent with the court and generally consult with a lawyer before doing so, ADEA class members are "*not* absent in the way Federal Rule plaintiffs may be absent." *See Woodall*, 913 F.2d at 451 (emphasis added). "The assumption that ADEA class members are not 'absent' plaintiffs accounts for the reason there is no provision similar to Rule 23(e) in the ADEA enforcement scheme." *Id.*

11

For the reasons which follow, the court concludes that the proposed class action settlement is fair, adequate and reasonable. *See Pigford*, 185 F.R.D. at 113 (approving class action settlement).

## V.     DISCUSSION

### A.     Allocation of Award Between Class Counsel and Class Members: Equitableness of Class Counsel's Fee Award

#### 1.     The Common-Fund Doctrine

Under the so-called American Rule, in contrast to the rule prevailing in England, a prevailing party ordinarily may not recover attorneys' fees from the losing party. *See Alyeska Pipeline Service Co. v. Wilderness Soc'y*, 421 U.S. 240, 245 (1975). The American Rule admits of an exception, however, for class actions, called the common-fund doctrine. That doctrine "allows a party who creates, preserves or increases the value of a fund in which others have an ownership interest to be reimbursed from that fund for litigation expenses incurred, including counsel fees." *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993). The common-fund doctrine is based on the equitable notion that those who have benefitted from the litigation should share its cost. *See* Report of the Third Circuit Task Force, Court-Awarded Attorneys Fees, 108 F.R.D. 237, 250 (3d Cir. 1985); *see also Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole").

The D.C. Circuit has approved the application of the common-fund doctrine in cases brought against government defendants. The Circuit specifically rejected a government defendant's argument that its case "should be treated differently than any other common fund cases simply because it successfully challenged illegal government actions." *Swedish Hosp. Corp.*, 1 F.3d at 1270.

Application of the common-fund doctrine has also been approved in cases where fees could otherwise be awarded under fee-shifting statutes. *See Florin v. NationsBank of Georgia,*

*N.A.*, 34 F.3d 560, 563 (7th Cir. 1994) (ERISA). This is significant because prevailing ADEA plaintiffs may recover fees against the federal government pursuant to statute.[9]

      2.    D.C. Circuit's "Percentage of Recovery" Standard

In common-fund cases such as this one, the D.C. Circuit determines the reasonableness of a proposed fee allocation by measuring it as a percentage of the total recovery (whether by verdict or by settlement). This court determines that when the entire value of the settlement is taken into account, the proposed allocation of fees is reasonable and is within the range of recovery approved by the courts.

The D.C. Circuit has endorsed the percentage-of-recovery standard over the lodestar-multiplier approach. *See Swedish Hosp. Corp.*, 1 F.3d at 1271. In determining an appropriate common-fund figure as a percentage of recovery, the district court is to consider "indicia of overall reasonableness" based on the circumstances in the case. *See Commonwealth of Puerto Rico v. Heckler*, 745 F.2d 709, 714 (D.C. Cir. 1984). According to our Circuit, "a majority of common-fund class action fee awards [approved] fall between twenty and thirty percent" of the plaintiff class' total recovery. *See Swedish Hosp. Corp.*, 1 F.3d at 1272. The Circuit has also recently approved a fee award amounting to 36% of the total recovery in a Title VII class action brought against a federal agency. *See Thomas v. Albright*, 139 F.3d 227, 229-30 (D.C. Cir. 1998) (African-American Foreign Service officers settled racial discrimination and retaliation claims asserted against State Department, and court approved $2.1 million in fees out of a total recovery of $5.9 million). *Thomas* strengthens the case for the equitableness of the $2 million fee here, because the fee represents just over 36% (36.36%) of the total $5.5 million cash recovery. In light of these precedents from our Court of Appeals, and in light of the extensive and excellent

---

[9]     There is some authority in this Circuit holding that ADEA plaintiffs may recover fees directly under the ADEA, *see Krodel v. Young*, 576 F. Supp. 390 (D.D.C. 1983), *aff'd o.g.*, 748 F.2d 701 (D.C. Cir. 1984), while other cases hold ADEA plaintiffs may recover fees against the federal government under the Equal Access to Justice Act. *See Muth v. Marsh*, 525 F. Supp. 604, 607-609 (D.D.C. 1981); *accord Nowd v. Rubin*, 76 F.3d 25 (1st Cir. 1996).

work done by class counsel, the court determines that the fee allocation is reasonable and equitable.

### 3.    Comparison to Lodestar Approach

In common-fund cases, the other popular standard for assessing the reasonableness of attorney-fee allocations is the lodestar-multiplier approach. Although the D.C. Circuit does not follow the lodestar-multiplier approach in common-fund cases, the court notes that the proposed fee allocations would also be reasonable under that approach. The plaintiffs provided, and the court has reviewed the materials needed to calculate what they would earn in fees under the lodestar-multiplier standard: a *Laffey*[10] Matrix of prevailing hourly rates for similarly experienced attorneys in the Washington, D.C. area, resumes and declarations establishing the attorneys' level of experience, and a detailed accounting of the hours worked by Raymond Fay, Laura Fentonmiller, Stephanie Moran, Burton Fretz and Rochelle Rowlette, the attorneys for the plaintiff class, and their staffs.[11]

### B.    Allocation of Award Between Plaintiffs and Other Class Members

As discussed above, the settlement requires AID to pay $63,000 to each of the 37 named plaintiffs and $23,000 to each of the 53 non-named members. The court determines that it is equitable to allocate a higher award to the named plaintiffs, because they took the initiative to become actively involved with the lawsuit, and they bore the brunt of the enormous effort required to prepare and prosecute the case. The named plaintiffs expended their own time and funds to consult with class counsel over the telephone, by mail and in face-to-face meetings. Moreover, many of the named plaintiffs were deposed or participated in trial by testifying and

---

[10]     *See Laffey v. Northwest Airlines*, 746 F.2d 4 (D.C. Cir. 1984), *cert. den.*, 472 U.S. 1021 (1985).

[11]     The court also takes note that the proposed fee allocation would pay plaintiffs' counsel substantially less than they would have been due under their fee agreement with the 37 named plaintiffs. Under the fee agreement, plaintiffs' counsel would have been owed over $3 million. Instead, the settlement pays class counsel just over $2 million, roughly two-thirds of the compensation they could seek under their contract with the plaintiffs.

undergoing both direct and cross-examination.  Just as significant, the named plaintiffs entered into a representation agreement and obligated themselves to pay fees and costs to class counsel. The non-named class members were contacted by class counsel and afforded the opportunity to participate actively in the action, but they chose not to do so.  That choice does not render them blameworthy in any way, nor does it mean that they are entitled to no portion of the settlement proceeds.  It does, however, substantially undermine their argument that they must receive a greater share of the cash payments vis-a-vis the active class members.

The only class members who do not receive any monetary award under the settlement are the six members who were never terminated as a result of the reduction in force.  The court perceives no inequity in directing the cash proceeds of the settlement towards those class members who actually lost their jobs, with the loss of income, benefits and potentially pension benefits which that entails.  While the non-RIF'd class members may have experienced anxiety during the period when it appeared that they might be RIF'd, the court cannot say the settlement is inequitable because the parties agreed to direct financial compensation only to those who suffered financial harm.  In short, under these circumstances equity does not require the parties to divert proceeds from employees who suffered termination to those who continued their employment with AID uninterrupted.

### C.      Objections of Class Member, Mr. Delaney

#### i.      Background

Richard Delaney filed an appeal with the Merit Systems Protection Board ("MSPB"), alleging that the RIF was retaliatory as to him.  In August 1999, AID settled the MSPB action and reinstated Mr. Delaney retroactive to the 1996 RIF date, with back-pay.  *See* Letter Brief of Richard J. Delaney dated April 28, 2000 ("Delaney") at 2 n.1.  Mr. Delaney currently works in AID's Europe and Eurasia Bureau.  In February 2000, however, the AID indicated that it intended to count Mr. Delaney's recovery in this action as an "offset" against the backpay owed him under the MSPB settlement.  *Id.* at 1-2.  In other words, for every dollar Mr. Delaney receives under the instant proposed settlement, AID apparently planned to pay Mr. Delaney one dollar less under the MSPB settlement.

15

ii      Addressing Mr. Delaney's First Objection:  AID is Not Treating His Recovery as Back Pay while Treating Other Members Differently

The crux of Mr. Delaney's objection is that AID is treating his settlement payment as "back pay" but is not treating other class members' settlement payments as back pay.  Mr. Delaney believes that this aspect of the settlement "singles him out for disparate and inequitable treatment . . . compared with other class members."  Delaney at 1.  Specifically, he contends that even though he is entitled to $22,000 as a non-named class member,[12] the settlement "effectively seeks to deny him -- and him alone -- settlement payment."  *Id.*

Two provisions in the proposed Settlement are relevant to Mr. Delaney's objection.  Mr. Delaney relies on Paragraph I.A, which provides, in pertinent part,

> This settlement agreement does not . . . relate to . . . claims brought by the . . . class members pending as of December 23, 1999, in other forums such as the . . . Merit Systems Protection Board . . . . * * *  [T]he fact of settlement or the Settlement Agreement is not to be used in other proceedings, as set forth in paragraph VI.C [the Paragraph where AID disclaims liability or wrongdoing].

Delaney at 7-8.

Mr. Delaney also objects to the Paragraph which provides:

> [T]he fact of settlement or the Settlement Agreement is not to be used in other proceedings . . . except that . . . for example, *the Agency shall be entitled to claim an offset against back pay and any other monetary recovery in such other proceedings* for the full extent of the payment received by the class members under [the section of the instant proposed settlement which provides for monetary payments].

*Id.* at 2 (italics added).  Mr. Delaney wants this offset provision deleted.

Mr. Delaney complains that AID did not apply a comparable offset analysis to other AID employees who have received various payments from AID since the RIF.  For example, Mr.

---

[12]      Nothing in the record suggests that AID intends to withhold the $22,000 to which Mr. Delaney is entitled under this settlement. AID has expressed no such intention, and Mr. Delaney has not accused AID of harboring such an intent.

16

Delaney notes, other RIF'd AID employees have received the following payments without AID stating an intention to deduct their class settlement recoveries:

(1)    salary, for those reinstated (named plaintiff David Evans and five other employees);

(2)    federal annuity payments, for other employees, presumably those who were not reinstated;

(3)    payment under Personal Service Contracts (Gordon Straub and eight other employees).

*Id.* at 3.

Mr. Delaney contends that "back pay damage analysis requires that the full amount of U.S. Government salary and annuity payments and interim contract earnings be deducted from back pay." *Id.* at 5 (citing 5 C.F.R. § 550.805(e)). He claims that, under the Back Pay Act and regulations, back pay results only "when an appropriate authority has determined that an employee was affected by an unjustified or unwarranted personnel action" and the authority "corrects or directs the correction of [the] unjustified or unwarranted personnel action." Delaney at 9 (citing 5 C.F.R. § 550.804); Delaney at 10 (citing *Pickard v. Dep't. of Transp.*, 25 M.S.P.R. 404 (1984)). He reasons that because the settlement disclaims wrongdoing, there is no finding of an "unwarranted or unjustified" personnel action as needed to characterize a payment as "back pay." Consequently, he reasons, a settlement payment which does not meet the definition of "back pay" cannot be classified as backpay and offset against backpay awards in other proceedings.

Mr. Delaney also contends that AID should be doing two things if it were treating other class members the same as him: (1) define the settlement payments of the other class members as back pay; and (2) deduct post-RIF salary, personal service contract and annuity payments from each class member's "back pay" recovery in the instant matter. If AID did so, many class members would not be entitled to *any* payment under the instant settlement, because their post-RIF pay exceeds their payment under the instant settlement. In sum, Mr. Delaney complains that AID is "improperly equating [his] settlement payment as back pay under the Back Pay Act, . . . ." Delaney at 10.

While Mr. Delaney's argument is well articulated, it is ultimately misguided. Nowhere does the settlement characterize Mr. Delaney's payment – or any other class member's payment -

- as back pay.  The settlement merely says that whatever payment a class member receives under the settlement, AID has the right to claim a credit ("offset") for that payment against awards due in other proceedings.  Mr. Delaney does have a legitimate concern about the possible interpretation of AID's "right to claim an offset," and the court will address that concern below.

> iii.    Addressing Mr. Delaney's Second Objection:  AID May Properly Disclaim Wrongdoing _and_ Require Class Members not to Use Settlement Elsewhere

Mr. Delaney also contends that AID is trying to "have it both ways" by disclaiming wrongdoing but also prohibiting class members from using the settlement in other proceedings. _See_ Delaney at 8.  This argument is unsupported.  Mr. Delaney points to no authority holding that a settlement cannot simultaneously disclaim wrongdoing by the defendant and require the plaintiff not to invoke the settlement in other proceedings.  As consideration for the benefits the plaintiff class receives under the settlement, the class is free to foreswear using the settlement as a sword in disputes in other forums.  In short, provided that the settlement as a whole is equitable, the court discerns no impropriety in the parties agreeing to these two provisions, and no necessary conflict between the two.

> iv.    Addressing Mr. Delaney's Third Objection:
> The Offset Provision is not Inconsistent with the Rest of the Settlement

Mr. Delaney also contends that the settlement itself prohibits the offset provision.  This assertion lacks merit as well.  Mr. Delaney invokes Paragraph IV.A.3, which states, "Defendants agree not to take a position on the proposed allocations [of payments among the class members] in this paragraph."  By its terms, however, this provision has nothing to do with the offset provision.  Paragraph IV.A.3 merely obligates defendants to stay quiet on the plaintiffs' proposal for allocating the recovery among class members under the settlement.  The defendants have done so.

Agreeing to the offset provision does not make the defendants guilty of objecting to the proposed allocation.  This is because the offset provision deals with AID's right to claim a credit, _in other proceedings_, for a person's recovery in this action.  The offset provision will come into

play, if at all, only after the instant settlement proceeds have been paid to the class members. Thus, the offset provision has no effect on how the class's recovery is allocated among the class members. The way to confirm this is to consider how the parties would implement the settlement *without* the offset provision: AID would be obligated to pay Mr. Delaney the same $22,000, no more and no less. The only difference would be that AID would not be entitled to claim a credit, *in other proceedings*, to reflect his recovery in this action.

v.    Addressing Mr. Delaney's Fourth Objection:<br>
As Construed by the Court, the Offset Provision is not Unfair

As mentioned above, the settlement provides that AID "shall be entitled to claim an offset against back pay and any other monetary recovery in . . . other proceedings for the full extent of the payment received by the class members under" the instant settlement. *See* ¶ I.A. The court and the parties have referred to this as "the offset provision." Mr. Delaney expressed his concern that AID would proffer the offset provision as an automatic entitlement to deduct his recovery under this settlement from any recovery he secures in his related MSPB proceeding. In other words, Mr. Delaney is apprehensive that AID will take the offset unilaterally, without seeking a ruling and permission to do so from the MSPB judge. Mr. Delaney's concern stems at least in part from AID submissions to the MSPB and AID correspondence with plaintiff class counsel. In those documents, AID makes statements which could be construed as expressing an intent to automatically and unilaterally take an offset against Mr. Delaney's recovery without seeking a ruling from the MSPB on the lawfulness on doing so. Mr. Delaney contends that the Back Pay Act and other legal authorities prohibit AID from taking such an offset against his back-pay recovery in the MSPB proceeding. The court intimates no view on the merits of that question. More importantly for our purposes, Mr. Delaney contends that he should have the opportunity to argue that issue before the MSPB judge.

On this score the court agrees with Mr. Delaney. The court determines that the offset provision does *not* entitle AID to take the offset unilaterally without first seeking and obtaining and the MSPB judge's permission to do so. Mr. Delaney and the plaintiffs presented persuasive evidence from which the court makes the following findings with regard to the proper

19

interpretation of Paragraph I.A's offset provision: (1) the parties negotiated extensively over the precise language of the offset provision in Paragraph I.A; (2) the defendants favored and specifically requested "right to take an offset" language which could automatically entitle them to take the offset in "other proceedings" such as Mr. Delaney's MSPB proceedings; (3) the plaintiffs expressly and specifically opposed the requested modification of the offset language; (4) the plaintiffs insisted on maintaining the "right to *claim* an offset" language; (5) both the plaintiffs and the defendants had the understanding and expectation, when they executed the settlement agreement, that Paragraph I.A's "right to *claim* an offset" provision will *not* automatically entitle AID to take an offset in class members' "other proceedings," including but not limited to Mr. Delaney's MSPB proceeding; and (6) in other words, both plaintiffs and defendants had the understanding and expectation, when they executed the settlement agreement, that AID may not take the offset in an "other proceeding" until and unless the judicial officer presiding over that proceeding rules that AID may do so within the confines of the Back Pay Act or other applicable legal authority.

In other words, the court has adopted the construction of the offset provision which is favorable to Mr. Delaney and unfavorable to AID, eliminating his concern as to the provision's possible prejudicial effect in his MSPB proceeding. As thus construed, the offset provision is not inequitable to Mr. Delaney or to any other member of the plaintiff class.

## V.    CONCLUSION

For the foregoing reasons, the court concludes that the proposed class settlement agreement is equitable and adequately reflects and protects the interests of the class members. The court also concludes that the objections lodged by class member Delaney, while reflecting sincere concerns, identify no inequity in the settlement and present no obstacle to its final approval. Accordingly, the court grants final approval of the class settlement agreement.[13] An

---

[13]    By the terms of the settlement, this court retains jurisdiction for three years to enforce the agreement, if necessary. *See* ¶ V. However, the class members agree to give AID at least 30 days' notice of any alleged violation before seeking relief from the court.

20

Order directing the parties in a fashion consistent with this Memorandum Opinion was previously issued. This Opinion is executed and issued this 3d day of October 2000.[14]

_Ricardo M. Urbina_
Ricardo M. Urbina
United States District Judge

---

_See_ ¶ VI-D. If the court is called upon to resolve a dispute over interpretation of, or compliance with the settlement, the agreement shall not be construed against either side. _See_ ¶ VI-G. The class may apply for fees and costs incurred in connection with such a dispute. _See_ ¶ VI-D.

[14] The parties disagree over _when_ the defendants must make the monetary payments to class members and class counsel which are required by the settlement. By Order dated September 7, 2000, the court referred this dispute to the Honorable John Michael Facciola, United States Magistrate Judge.

21

*Evans v. Atwood (USAID)*, #1996-cv-2746

---

**Raymond C. Fay, Esq.**
Laura C. Fentonmiller, Esq.
Bell, Boyd & Lloyd
1615 L Street, N.W., Suite 1200
Washington, D.C. 20036-5601
*Co-Counsel for the plaintiff class, David Evans et al.*

---

**Burton D. Fretz, Esq.**
Rochelle Rowlette, Esq.
National Senior Citizens Law Center
1101 14th Street, N.W., Suite 400
Washington, D.C. 20005
*Co-Counsel for the plaintiff class, David Evans et al.*

---

**Mr. Richard J. Delaney**
3708 Jennifer Street, N.W.
Washington, D.C. 20015
*Member of the plaintiff class*

---

**Mr. David Evans**
3422 Valewood Drive
Oakton, Virginia 22124
*Member of the plaintiff class*

---

**Rudolph Contreras, Esq.**
Michael Humphreys, Esq.
Assistant United States Attorneys
555 4th Street, N.W.
Judiciary Center Building, Room 10-814
Washington, D.C. 20001
*Counsel for the Defendants, the United States Agency for International Development*

---

**The law clerk assigned to this action is:**        **John M. Brendel, Esq.**
**(202) 354-3391**, fax -3392